252 Minn. 490 (1958)
91 N.W. (2d) 448
IN RE BABY GIRL LARSON, ALSO KNOWN AS VICTORIA LARSON.
MARGARET M. LARSON
v.
HENNEPIN COUNTY WELFARE BOARD AND LUTHERAN WELFARE SOCIETY.
No. 37,417.
Supreme Court of Minnesota.
May 29, 1958.
*491 Nemerov, Perl & Johnson, for appellant.
George M. Scott, County Attorney, and Douglas X. Juneau and Theodore R. Rix, Assistant County Attorneys, for respondent Hennepin County Welfare Board.
Arthur C. Wangaard and Carl F. Granrud, for respondent Lutheran Welfare Society.
THOMAS GALLAGHER, JUSTICE.
This is an appeal from an order of the District Court of Hennepin County, made August 3, 1957, which denied the petition of Margaret M. Larson (1) to vacate a prior order of the court dated November 30, 1956, wherein it committed Victoria Larson, the child of petitioner born September 11, 1956, to the general guardianship of Lutheran Welfare Society of Minneapolis on the ground that she was dependent and neglected; (2) to vacate a subsequent order dated April 26, 1957, amending the prior order to the extent that the commitment to guardianship order therein was found to be based upon petitioner's written consent thereto dated April 26, 1957, and to adjudge such consent null and void; and (3) to vacate the commitment to general guardianship and restore the child to petitioner.
In a memorandum attached to the order from which this appeal is taken, the trial court stated:
"On all of the evidence * * * it was the feeling of the Court that the *492 child * * * was a dependent and neglected child who needed more realistic and permanent plans made for her under Chapter 260 * * *.
"The petitioner's various plans for the child * * * have centered around unrealistic and unfortunate basis. She claims * * * a promise of marriage by the child's acknowledged father [who, without petitioner's knowledge, had married subsequently] * * *. [And] * * * it was her persistent plan * * * to promote a divorce between this man and his wife so she could marry him * * *.

* * * * *
"* * * There seems to be little if any basis for the claim now made by the petitioner that her consent to such commitment that resulted in the order of April 26, 1957, was not voluntary and that it was made under duress."
Shortly after the child was born on September 11, 1956, petitioner, in conjunction with the Hennepin County Welfare Board, made arrangements to have her cared for in a boarding home selected by the board. All expenses therefor were paid for by petitioner with the exception of $44.55 paid by the board for the first month's care. A few weeks thereafter the board, without petitioner's knowledge, filed a petition in the juvenile court of Hennepin County, setting forth that the child was "illegitimate" and "without a parent or lawful guardian able to adequately provide for her support, training and education and that the mother of said child neglects and fails to provide a suitable home for said child"; and praying that the child be brought before the court and her alleged dependency and neglected condition be inquired into and that she be further dealt with in accordance with law.
At the hearing petitioner was not represented by counsel nor advised that she was entitled thereto until subsequent to the submission of all the evidence. The evidence presented fails to indicate anything to support the claims that petitioner had neglected the child or had failed to provide her with a suitable home. Some testimony was presented to create the impression that her only permanent plan for the child was based upon her reliance on the statements of the acknowledged father made without her urging after she discovered that he had married in Illinois that he contemplated obtaining a divorce and thereafter marrying *493 petitioner so that he could care for her and the child. With reference to such plans, petitioner, without the aid of counsel, testified as follows:
"I want to keep the baby very definitely. I have been trying to find a good place to keep her with me but it took time. I didn't want her in a home that wasn't clean or with somebody that maybe couldn't give her enough of the proper attention. * * * I have been interviewing numerous women who are willing to give child care and I have inspected their homes to determine whether or not it would be a satisfactory arrangement. Up until Sunday I was unable to find anything that I felt was suitable. * * * if we [referring to the child's father] were married soon my family and the children [her three sons by a former marriage] would not realize that we had not been married a year ago and they would accept it as a legitimate birth, but I feel at this time that the important thing is to have the baby with me so she recognizes me * * *.

* * * * *
"* * * I have found this home where I can keep the baby in town. I cannot have the [two] older boys regardless because Jeffery is to stay with his Big Brother through the school term [and] * * * Rex has been with me only nine months in the last three and a half years * * *. I feel it is kindness to leave Rex where he is [with his father].

* * * * *
"The Court: What are your ideas about possible marriage in that direction now [to the father]?
"Mrs. Larson: I don't think that is as important as taking care of the baby. I feel that if in the future he is still interested in marriage we could be married * * *. [But]

* * * * *
"* * * I don't want him to make arrangements to get married to me if it's going to hurt them [his present wife and family] but you see I didn't know he was married until just this past April and he had been * * * discussing plans for marriage during  well, two years, so I was not aware of the fact that there was a wife so if it would be any hardship on them I would not encourage him. * * * I don't think we will discuss it any farther but I still feel that I can take care of the baby as well by myself as anyone else and I feel she would add to our family because *494 it would give Tom [her youngest son] companionship and he is the only one I will have with me now."
The order of November 30, 1956, in which the court found the child neglected and dependent and committed her to general guardianship, was made upon the evidence outlined. On December 7, 1956, petitioner was notified that the child had been committed to the general guardianship of the Lutheran Welfare Society and that she would not be notified of any subsequent adoption proceedings. She immediately called upon representatives of the Hennepin County Welfare Board and asked the meaning of the order. She was told to confer with the judge of the juvenile court and thereafter, on December 18, 1956, was advised by the latter that his decision had been made for the best interests of the child. In January 1957 the child's father called upon the court and advised it that, in his opinion, petitioner would be a good mother to the child and wanted its custody. On January 11, 1957, in the midst of these conferences and proceedings, and without petitioner's knowledge or consent, the Lutheran Welfare Society placed the child in an adoptive home.
On April 2, 1957, petitioner moved for an order vacating and setting aside the order of November 30, 1956, and for a further order directing that the child be returned to her. During the pendency of these proceedings, petitioner changed counsel. Counsel selected by her testified that petitioner had called upon him in March 1957 and instructed him to undertake proceedings to regain custody of the child for her; that at that time she had paid him the sum of $200 to cover his fees; that he then advised her that the case "had not too much merit"; but thereafter he discussed the case with her several times; that the day before the hearing "the father [of the child] and I * * * talked the case over * * * and finally concluded that for the best interests of the baby, and for Margaret's interests * * * it would be better to have the record show that she consented * * * to the adoption * * * so the record wouldn't indicate the child was taken away." It was not disclosed on what basis counsel had arrived at this conclusion or why he had recommended that the consent to the commitment be made by his client.
In an affidavit with reference thereto, petitioner affirmed that during *495 the last part of April 1957 her counsel told her "it would be best not to try to regain the custody of the baby, and told her to sign a release of the baby and in that way the file would be sealed and that nobody could see it"; that "unless she signed the release, the file would be open to her boys to look at, and for her former husband to look at, and told her that this was the best"; and that she signed the release, protesting that it was not voluntary and not without duress and persuasion as stated in the form submitted therefor.
Thereafter, petitioner, at her own expense, employed other counsel and instructed him to again move to vacate the previous orders and to seek an order discharging the child from guardianship and restoring her to petitioner. At the hearing held thereon on June 12, 1957, evidence was submitted substantially in accordance with that taken at the first hearing.
1. A diligent examination of all the evidence fails to disclose anything to support a finding that petitioner's child had been dependent and neglected prior to either the time the order of November 30, 1956, was made, or to the time it was amended on April 26, 1957. It does reveal that petitioner is qualified financially, physically, and morally to care for the child. She is in sound physical and mental condition. She is employed in a responsible position by an insurance company and is earning in excess of $270 per month, plus a sum withheld monthly under a company pension plan. She is the owner of a large residence in the Kenwood district in Minneapolis, where she can reside with her family or which she may rent if she desires to seek another home where she might live as part of a family so that she could devote more of her time to the child. Her employer testified that she had given them long and faithful service in responsible positions. Her neighbors testified that they had observed her in her home and had observed her family relationships and that she was of good moral character; that her children were well governed; and that her family home was neat and well kept. Her brothers and sisters-in-law testified as to her good character and ability and indicated their willingness to cooperate with her in every way to make a good home for her family.
2. That at one time petitioner contemplated a plan of marriage with the child's father, first formulated when she was not aware that he had *496 married in Illinois, and subsequently adhered to because of her reliance on other false statements he had made to her, would not establish her neglect of the child or that other definite and practical plans submitted by her and not challenged by respondents were not adequate. No doubt similar plans are being followed in numerous cases where mothers in similar situations are required to work outside the home to support their children.
3. With respect to the consent signed by petitioner, we do not feel that it should be given any weight in these proceedings. It was not made until subsequent to the order of commitment to general guardianship and hence could form no basis for the support thereof. Prior to signing it, petitioner had paid her counsel the sum of $200 to regain custody of her child, and not merely to be advised that if she signed a consent to the commitment order she would be left in a more secure position as far as her reputation is concerned. That she was induced to sign the commitment against her own better judgment at a time when she was under the stress and worry involved in the proceedings seems clear, both from the surrounding circumstances and from statements made in her affidavits, which, for the most part, are corroborated by other evidence and are uncontradicted. We cannot escape the conclusion that, under the circumstances, it should be regarded as entirely ineffective in these proceedings. State ex rel. Nelson v. Whaley, 246 Minn. 535, 75 N.W. (2d) 786; In re Adoption of Anderson, 189 Minn. 85, 248 N.W. 657.
4. It is too well settled to require citations that the right of a parent to the custody of a child is paramount or superior to that of any other person; that a mother is presumed to be a fit and suitable person to be entrusted with the care of her child; and that the burden of disproving this presumption rests upon the person challenging it. Further, by statute it is provided (M.S.A. 260.11) that "In no case shall a dependent child be taken from its parents without their consent unless, after diligent effort has been made to avoid such separation, the same shall be found needful in order to prevent serious detriment to the welfare of such child." Under these well-established principles, and in accordance with the provisions of § 260.11, we cannot escape the conclusion that, under the evidence submitted as outlined above, the orders *497 of general guardianship are entirely without support and accordingly that the order appealed from should be reversed.
Reversed with directions to vacate the orders of November 30, 1956, and April 26, 1957, and to restore the person and custody of the child, Victoria Larson, to her mother, petitioner herein.