Thomas D. McGURREN, Plaintiff
and Appellant,

v.

S. T. et al., Respondents and Appellees.

Civ. No. 9191.

Supreme Court of North Dakota.

May 12, 1976.

**692**

John M. Olson, State's Atty., and Robert P. Bennett, Asst. State's Atty. (argued), for plaintiff-appellant.

Irvin B. Nodland, Bismarck, filed a brief as Guardian ad Litem for Baby Boy T.

Gregory D. Morris, Bismarck, for appellee S. T.

SAND, Judge.

This is an appeal from the order of the Juvenile Court of Burleigh County dismissing the petition of Thomas D. McGurren, Director of Juvenile Court Services for Burleigh County, for the termination of the parental rights of the mother of Baby Boy T.

Baby Boy T. was born June 19, 1975. At the time of Baby Boy T.'s birth his mother was thirteen years old and unmarried. On the date of Baby Boy T.'s birth the child was taken by the Burleigh County Social Services, pursuant to a temporary order of the juvenile court, for placement in a foster home. The mother, therefore, has never had custody or control of her son. McGurren filed a petition on June 26, 1975, alleging that Baby Boy T. was a deprived child under Chapter 27–20, North Dakota Century Code, and asking the juvenile court to terminate the parental rights of the mother and to transfer the care, custody, and control of the child to the Executive Director of the Social Services Board of North Dakota, or a licensed child-placing agency willing to accept custody for the purpose of placing the infant for adoption or in a foster home. The hearing on the petition was set for July 21 and was continued to December 9, at which time the court denied the petition for termination of the parental rights of the mother. Custody of Baby Boy T. was continued with the Burleigh County Social Services until a decision could be reached on the immediate placement of the child. The petitioner, McGurren, has appealed from this order of the court dismissing his petition. McGurren contends that sufficient evidence exists to find the child was a deprived child under Chapter 27–20 and to grant the petition and that denial of the petition will deprive the child of his right to "pursue and obtain happiness under Article I, § 1, of the Constitution of the State of North Dakota."

During oral argument, counsel for petitioner-appellant also argued in the alterna-

tive that the case should be remanded to the juvenile court with instructions. He was then asked if the argument constituted an admission by him that the record before us was not adequate to support the relief requested here and also in the juvenile court. He responded that he asked for a remand because the juvenile court had not followed the decision rendered by this court in *In re H.,* 206 N.W.2d 871 (N.D.1973), and that the case should be remanded to give the juvenile court an opportunity to apply the rule of law set out in that case.

The issue presented in this case is somewhat similar to that in *In re H., supra,* but factually there are some distinguishing factors. In *In re H.,* the mother was adjudged an unruly child and was under the care and custody of the State authority. Also, the juvenile court had found the child a deprived child. Neither one of these facts is present in the instant case. The court in *In re H.* stated the issue as:

"   .   .   . May the juvenile court, on the basis of prognostic evidence indicating the mother's inability to provide proper parental care for her child, terminate the parental rights of the mother in her child, where the mother has never had the opportunity to demonstrate her maternal abilities because the custody of the child had been placed in the county welfare board immediately upon its birth?"

Section 27–20–03, NDCC, states that the juvenile court has exclusive original jurisdiction of proceedings for the termination of parental rights, except where they are a part of an adoption proceeding. Therefore, these proceedings are governed by the Uniform Juvenile Court Act, Chapter 27–20, NDCC.

Section 27–20–44, NDCC, states:

"1. The court by order may terminate the parental rights of a parent with respect to his child if:

"a.   .   .   .

"b. The child is a deprived child and the court finds that the conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suf-

fering or will probably suffer serious physical, mental, moral, or emotional harm; or

"c.   .   .   . "

Section 27–20–02(5), NDCC defines a "deprived child" as one who:

"a. Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of his parents, guardian, or other custodian;

"b. Has been placed for care or adoption in violation of law; or

"c. Has been abandoned by his parents, guardian, or other custodian."

■■■ In *In re H., supra,* this court after referring to the North Dakota Uniform Juvenile Court Act, which conferred jurisdiction upon the juvenile court to terminate the parental rights, stated:

"Thus, § 27–20–44(1)(b) requires that the evidence establish three factors before a juvenile court may terminate the parental rights of a parent. These factors are: 1) that the child is a 'deprived child' within the purview of the Uniform Juvenile Court Act, Chapter 27–20, N.D.C.C.; 2) that the conditions and causes of the deprivation are likely to continue or will not be remedied; and 3) that by reason of these continuous or irremediable conditions and causes the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm."

However, fitness is another factor to be considered and a hearing on this factor is constitutionally required. In *Kottsick v. Carlson,* 241 N.W.2d 842 (N.D.1976), we said, "the parent of a child has a constitutional right to be heard on his fitness before the parent can be deprived of his parental rights of the child."

■■ The appellant in *In re H., supra,* argued that the child was not a "deprived child" under § 27–20–02(5)(a) because, though it had at no time received any pa-

rental care, it had always had other care. The court stated that it would not be limited by so literal a construction of the statute. The court stated, at 206 N.W.2d 874:

"Therefore, we conclude that § 27–20–02(5)(a), N.D.C.C., should be construed so as to include within its definition of a 'deprived child' the child of a mother who, while never having had the opportunity to care for her child and thereby demonstrate her maternal abilities, is shown to be presently incapable of providing proper parental care for her child. Such a construction would be consistent with the stated purpose of the Uniform Juvenile Court Act (Ch. 27–20, N.D.C.C.), which is to provide for the care, protection, and wholesome moral, mental, and physical development of a child (§ 27–20–01, N.D.C.C.), since such construction would enable the juvenile court to take custody of a child pursuant to § 27–20–30, N.D.C.C., solely upon the basis of sufficient prognostic evidence that the mother would be incapable of providing proper parental care for the child, without requiring that the child be subjected to an actual deprivation before the juvenile court takes custody."

This reasoning is valid and may have application to this case depending on the facts that are developed. Nevertheless, the instant case must be decided on its own set of facts on an ad hoc basis.

The juvenile court found that it had not been proved by clear and convincing evidence that Baby Boy T. is a deprived child, as defined by Chapter 27–20, NDCC. The court stated that the mother has had no opportunity to display her ability to provide parental care, control, or subsistence and that the State failed to show "any inability on the part of the mother to provide for the physical, mental, or emotional health of the child, nor was any evidence forthcoming of any moral depravity which would adversely affect the child's interests."

This court's scope of review of decisions of juvenile cases under Chapter 27–20, NDCC, is much broader than in other cases tried to the court, and is equivalent to the former procedure of trial de novo. The findings of fact are reviewable without reference to the clearly erroneous rule of Rule 52(a), North Dakota Rules of Civil Procedure, but such findings are entitled to appreciable weight. *In the Interest of M. L.,* 239 N.W.2d 289 (N.D.1976); *In re H.,* 206 N.W.2d 871 (N.D.1973); *In re A. N.,* 201 N.W.2d 118 (N.D.1972); *In re J. Z.,* 190 N.W.2d 27 (N.D.1971).

We therefore review anew (de novo) the evidence produced at the hearing.

The mother was thirteen years old at the time of the birth of Baby Boy T. She lives with her divorced mother (hereinafter grandmother) and her sixteen-year old brother in a mobile home. She is a student in the seventh grade.

The mother does not have a steady job, although she has on occasion earned money as a babysitter for friends. Her total financial resources amount to $50 and a stereo. She is dependent on her mother for support, although she does on occasion receive money from her father. The mother claims she will be able to get money from Welfare if she needs it.

The mother attends school from 8:30 a. m. to 3:30 p. m. The grandmother works as a waitress four days a week from 11:00 a. m. to 2:00 p. m., and four or five evenings a week from 6:00 p. m. to 11:00 or 12:00 p. m. The mother claims that her older sister, who is married and has a child of her own, would be willing to care for Baby Boy T. during the day while she, the mother, is at school. The mother would care for the child in the evenings. She has not participated in social activities in the past so she does not expect to miss anything by caring for the child. She claims there is enough room at home for the child and that he will stay in her bedroom with her.

The situation at home between the mother and the child's grandmother is somewhat uncertain. The grandmother testified that the mother has caused some control problems since the birth of the child. The grandmother believes that the mother blames her for the child having been taken

from her. The grandmother stated that she didn't think the mother should have the child because there were "a lot of things for a 13 year old girl besides being kept at home and taking care of a baby." However, she also testified that it would be best if the mother did have the child because she would not be fit to live with otherwise. The grandmother testified that she believed the mother to be capable of caring for the baby and that she would help her care for him.

■ The basic premise in a termination of parental rights case is that a parent has a fundamental, natural right to his child. This right has been recognized to be of constitutional dimension. However, this is not an absolute right. *In re A. N.*, 201 N.W.2d 118 (N.D.1972); *In re J. Z.*, 190 N.W.2d 27 (N.D.1971).

■ The Legislature has noted a strong preference for parental guardianships. Section 27–20–01, NDCC, states that Chapter 27–20, NDCC, shall be construed to achieve its purposes in a family environment whenever possible, "separating the child from his parents only when necessary for his welfare or in the interest of public safety." Section 27–20–01(3), NDCC.

Pursuant to the provisions of § 27–20–01(1), the Uniform Juvenile Court Act is to be construed and interpreted to effectuate the following public purposes:

"1. To provide for the care, protection, and wholesome moral, mental, and physical development of children coming within its provisions;

.     .     .     .     .

Under the North Dakota Uniform Juvenile Court Act the parents' rights may not be terminated unless it has been shown that the child is a deprived child and that the deprivation is likely to continue so that the child will suffer serious physical, mental, moral, or emotional harm. Section 27–20–44(1)(b), NDCC. In addition, the "fitness" of the parent is to be considered.

■ The burden of proof lies on the petitioner to show that the statutory requirements have been met before the child

can be taken from its parent. *In re J. V.*, 185 N.W.2d 487 (N.D.1971).

The Minnesota Supreme Court, in discussing parental preference, stated that:

"It is too well settled to require citations that the right of a parent to the custody of a child is paramount or superior to that of any other person; that a mother is presumed to be a fit and suitable person to be entrusted with the care of her child; and that the burden of disproving this presumption rests upon the person challenging it." *In re Larson*, 252 Minn. 490, 91 N.W.2d 448 at 453 (1958).

*See also, Burrien v. Greene County*, 217 S.E.2d 854 (Va.1975); *Tester v. Priviksma*, 82 Misc.2d 88, 367 N.Y.S.2d 629 (1975).

In *In re H.*, 206 N.W.2d 871 (N.D.1973), this court refused to terminate the parental rights of a sixteen-year old unwed mother who had been judged an unruly child and was under the care, custody, and protection of the State Youth Authority. The court found that sufficient evidence had been presented for it to make a finding that the child was deprived, but that the court could not say that the deprivation was likely to continue, and therefore could not terminate the mother's rights. The court had heard testimony from counselors and social workers as to the ability of the mother to care for her child, but remanded so that additional evidence could be received. In the case at hand, only the mother of the child and her mother (grandmother of the child) testified. The State presented no witnesses to testify as to the fitness of the mother to care for her child.

In *In re Scarlett*, 231 N.W.2d 8 (Iowa 1975), the Iowa court was faced with a problem similar to that in *In re H., supra.* The State petitioned to terminate the parental rights of a thirteen-year old unwed mother who had been adjudged a delinquent child and was under the custody of the juvenile court. The finding that the mother was a delinquent child was based on a number of factors, including glue sniffing, smoking marijuana, and a course of

sexual promiscuity begun when she was eleven years old. The court found she was completely out of control of her parents. There was evidence from a number of witnesses, including social workers, doctors, and probation officers, that the mother was totally unsuited and unprepared to take the responsibility of caring for a child. The court, on this evidence, terminated the rights of the mother, stating that, though much of the evidence was prognostic, "we need not await the happening of tragic events to protect Jeremy."

The court cited *In the Interest of Kester,* 228 N.W.2d 107, 110 (Iowa 1975), where it said:

"A termination proceeding is not like a personal injury action where an injury must be proved before damages may be recovered. The termination statute is preventive as well as remedial. The statute mandates action to prevent probable harm to children and does not require delay until after the harm has been done."

*See also, State v. Blum,* 1 Or.App. 409, 463 P.2d 367 (1970).

The North Dakota Supreme Court in *In re A. N.,* 201 N.W.2d 118 (N.D.1972), terminated the rights of the parents in a battered child case. The court stated, at page 121:

"This court does not approve of a termination that is, in effect, prospective in operation. If a possibility of a correction in an existing situation exists, it would be preferable, we believe, to adjourn the hearing under a temporary order of placement without a future termination date. Upon a rehearing, if the conditions still exist, an immediate termination may then be made."

The court held that in this case, however, it would be best for the child to terminate the parental relationship immediately.

In *State v. McMaster,* 486 P.2d 567 (Or. 1971), the Oregon court refused to terminate the parental rights of parents who had had their child taken away from them because of neglect, but also refused to let them have custody at that time, leaving that decision to the juvenile court. The court stated, at page 572:

"We are of the opinion that the state of the McMaster family is duplicated in hundreds of thousands of American families, —transciency and incapacity, poverty and instability. The witness was undoubtedly correct when he stated that living in the McMaster household would not 'allow the child to maximize her potential.' However, we do not believe the legislature contemplated that parental rights could be terminated because the natural parents are unable to furnish surroundings which would enable the child to grow up as we would desire all children to do. . . . The best interests of the child are paramount; however, the courts cannot sever the McMaster's parental rights when many thousands of children are being raised under basically the same circumstances as this child."

In *In re Adoption of Hyatt,* 24 Ariz.App. 170, 536 P.2d 1062, 1068 (1975), the Arizona court said:

"The state and its courts should do everything in their power to keep the family together and not destroy it. . . If, for some reason, there is difficulty encountered . . . [social services] agencies are available which can give the family the needed support while preserving its unity. There are many families in which one parent is incapacitated or only one parent is living, but this does not justify the leviathan power of the state to descend upon it and snatch away a child."

The Massachusetts Supreme Court in *Petition of New England Home Little Wanderers,* 328 N.E.2d 854, 863 (Mass.1975), had under consideration a case involving a mother who had given up her unborn child to a Home for adoption and later changed her mind and wanted custody returned after ten months. The court held that the best interests of the child lay in remaining in its present home. The court found that the mother "took an unrealistic approach to her problems and never worked out a practical

way to implement her plans for herself or the child." The court stated:

> "In reaching our conclusion to support the judge's finding, we wish to point with emphasis that we do not lend any approval to dispensing with parental consent for other than substantial reasons."

There are, however, some differences between the Massachusetts case and the instant case.

In our case, the mother had never given up the child for adoption and, additionally, the trial court, or the juvenile court, did not make a finding justifying the termination of parental rights. The juvenile court's action was to the contrary. Thus, the Massachusetts case is readily distinguishable from our situation and is not applicable.

▮▮▮ From the case law as it has been developed over the years, it appears that the grounds for termination of parental rights must rest upon the attitude, conduct, ability, and such other matters relating to the parent's duties, responsibilities, and care for the child which may be, and frequently are, collectively referred to as "fitness." Nevertheless, the relationship of parent and child consisting of a bundle of essential human rights necessary for the preservation of society must be carefully balanced and jealously guarded. The "best interest of the child" in termination of parental rights in connection with adoption takes on a meaning which includes, amongst other things, the total relationship between child and parent pertaining to and involving heterogeneous values, rights, duties, and concepts.

The record in this case is rather meager and consists primarily of the evidence by the mother and grandmother of the child.

▮▮▮ Even though our review is on a de novo basis, we nevertheless may give appreciable weight to the juvenile court's evaluation of the testimony and its findings of fact. We cannot as a matter of law conclude that the juvenile court committed error by not allowing or granting the termination of the mother's parental rights. However, because a new requirement[1] has been added since the hearing on this, rather than affirm the judgment of the juvenile court we believe it would be in the further interest of justice to remand the case to the juvenile court with instructions and directions regarding what need be accomplished before any further hearings are held. The mother of the child, because of her tender years (the State has made this its main point) is entitled to available expert counseling on parent-and-child relations and obligations, along with the ramifications and responsibilities arising from such relationship before any further hearings may be held on the question of terminating her parental rights. The grandmother, because of the immediate relationship of the family unit, should also receive expert counseling as to what her role should or must be.

▮▮▮ On the record before us, the State has made no showing of an existing urgency to terminate the parental rights. At any future hearing the State will be required to establish the three basic requirements set out in § 27–20–44(1)(b), NDCC, in addition to the parent's unfitness before the parental rights may be terminated. We will require in this case that expert testimony be obtained, particularly if it is established that the child is deprived, as defined in the statute, and whether or not such condition is irremediable so as to cause Baby T. to suffer serious physical, mental, moral, or emotional harm in the future. We realize that such prognostic evidence will be somewhat speculative, but with the aid of such expert testimony the juvenile court will be in a better position to more correctly approach the probabilities, which is all we mortals can expect.

▮▮▮ Section 27–20–48, together with § 27–20–49, NDCC, provides for the ap-

---

1. *Kottsick v. Carlson (Carney)*, 241 N.W.2d 842 (N.D.1976), based on the holding in *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551, which resolved the rights between parent and child, particularly between an unwed father and his child.

**698**

pointment of a guardian and the payment of such expenses. The appointment of guardian ad litem contemplates counsel for the child. This was done in this case.

▮ The guardian ad litem filed a brief with this court in which he stated his position. He claims that the record does not substantiate a right on the part of the State to terminate the mother's parental rights. We do not disagree with this. He states his position, based upon information now made available, that the best interests of the child would be most likely served by granting custody of the child to the Burleigh County Juvenile Commissioner's office. It is his further position that such custody should be accompanied by an order requiring that the juvenile commissioner first tender custody of the baby to the grandmother and, in the event such offer of the child is rejected, the juvenile commissioner should then make such temporary placement and custody as may be determined by the juvenile commissioner in his discretion. The guardian ad litem argues that the mother is only a teenager and accordingly is subject to the rules, dictates, and parental guidance of the grandmother. If the mother is to remain in the home of the grandmother, and if the baby is also to be in that home, it would be essential that the grandmother have absolute right and be entitled to lay down the rules and regulations and the manner of child rearing for Baby T. If the grandmother finds that burden and responsibility intolerable, the burden and responsibility would be no less intolerable were the custody of the child granted to the natural mother. Finally, it is the position of the guardian ad litem and counsel that in the event the grandmother is unwilling to, or unable to, accept custody, in the further event the child were to be placed temporarily in some other home, visitation rights and privileges should be provided to the mother, just as visitation rights are granted by courts daily to natural parents whose children have been removed from them by reason of a court order in divorce cases, separation cases, and delinquency cases.

Without having the necessary facts or testimony that may be appropriate, we cannot with any reasonableness state that the positions of the guardian ad litem are entitled to special consideration or should be implemented. They are, however, entitled to consideration. However, we believe that the able guardian ad litem will make his views known again at a further hearing or proceeding and such views will be given due consideration.

The case is remanded with instructions to the juvenile court to enter judgment on remand affirming the trial court unless the State, within ten days of the remand, in writing, petitions the juvenile court for a further hearing on this matter. In the event that further proceedings are requested and will be had the court shall first require compliance with the directions set out hereinbefore.

No costs to be allowed to either party.

ERICKSTAD, C. J., and PAULSON and PEDERSON, JJ., concur.

VOGEL, Justice (dissenting).

I would affirm the district court ruling, rather than remanding for further proceedings.

The majority opinion states that "We cannot as a matter of law conclude that the juvenile court committed error by not allowing or granting the termination of the mother's parental rights." I agree. That should end our participation in the case. We should affirm, without any gratuitous directions to the juvenile court.

The only question before the juvenile court was whether the parental rights of the mother should be terminated. The same question was the only one presented to us. We are all agreed that the answer should be negative on the record before us. Since any interested party can petition the juvenile court at any time to reopen the case so long as parental rights are not terminated, or the court can reopen on its own motion, I see no point in directing the court to consider holding a new hearing.