## STATE of North Dakota, Plaintiff and Appellee,

v.

## Scott ROVANG, Defendant and Appellant.

### Cr. No. 836.

Supreme Court of North Dakota.

Oct. 25, 1982.

Charles Gilje, State's Atty., Jamestown, for plaintiff and appellee.

Hjellum, Weiss, Nerison, Jukkala & Wright, Jamestown, for defendant and appellant; argued by Charles M. Carvell, Jamestown.

SAND, Justice.

Scott Rovang appealed from a judgment of guilty of burglary[1] [NDCC § 12.1–22–02] entered after a bench trial by the district court.

Rovang's conviction was primarily based upon his confession made to law enforcement personnel on 3 June 1981. Rovang's attorney moved to suppress the 3 June 1981 statements made to private individuals

1. The notice of appeal was dated 23 February 1982, one day after the trial to the court. Judgment of conviction and sentencing was pronounced on Rovang on 23 March 1982. Rule 37(b), NDRCrimP, provides in part that:

"A notice of appeal filed after the announcement of the verdict, decision, sentence, or order but before entry of the judgment or order shall be treated as filed after such entry and on the day thereof."

(James Ronngren and Kevin Seher) and the 3 June 1981 confession made to law enforcement personnel. The district court,[2] after a hearing, suppressed Rovang's statements made to the private individuals because it determined those statements were not voluntarily made; however, the district court denied the motion to suppress the confession to law enforcement personnel because it was voluntarily made.

The James Ronngren residence in Jamestown, North Dakota, was burglarized during the afternoon of 28 May 1981. The items reported as stolen included loose change worth approximately $150.00, paper money worth approximately $900.00, approximately 70 Susan B. Anthony dollars, and approximately 20 silver dollars.

The local banks were notified to be on the lookout for persons passing those types of coins. Deb Schmidt, a teller at First Bank in Jamestown, reported to a Bank official that she had received some rolls of Susan B. Anthony dollars and that the person passing the rolls signed "S.A. Rovang" on one of the rolls.

The police department received this information from the Bank and Detective Leon Okerlund asked Ronngren to meet him at the First Bank. Ronngren and a friend, Kevin Seher, met Okerlund at First Bank where Ronngren recognized and identified some of the coins as those which were stolen from his residence.

Okerlund told Ronngren and Seher that there was not enough evidence to go and talk to Rovang about the burglary and that more evidence [3] would be needed. The testimony of Gary Ripley at the suppression hearing reflects that Okerlund also told Ronngren and Seher to " 'go out and get ahold of Scott Rovang and do anything they pleased to him, hit him, or whatever, and he [Okerlund] wouldn't bring any charges against them.' He [Okerlund] sent them out, more or less, is what he told me; the way I took it is he sent them out to go ahead and get the information from him [Rovang] and bring it back to him [Okerlund]." [4] However, Okerlund denied saying anything to that effect.

In any event, Ronngren and Seher ultimately confronted Rovang about the burglary twice on 3 June 1981. The first confrontation occurred when Ronngren and Seher saw Rovang near a trailer court in Jamestown, North Dakota. Ronngren and Seher confronted Rovang, and he denied that he burglarized Ronngren's residence. The confrontation lasted approximately 15 to 20 minutes and Rovang repeatedly denied any involvement in the burglary.

Ronngren testified at the suppression hearing that after the first confrontation with Rovang, he talked to an unidentified third party, who, in effect, implicated Rovang in the burglary of Ronngren's residence.

Ronngren and Seher subsequently saw Rovang near Coulston's grocery store and again confronted him. During this confrontation, a third individual, Chris Brown, was

---

2. This motion was heard by the Hon. M.C. Fredricks and the bench trial was heard by the Hon. John T. Paulson.

3. The record does not indicate if the officer considered NDCC § 12.1–23–08.3, dealing in stolen property.

4. According to Ripley's testimony at the suppression hearing, he was in the county jail on approximately 5 September 1981 when he had a discussion with Detective Okerlund. Ripley's testimony provides as follows:

"Q. Where did your conversation take place?

"A. It took place in Jack Miller's office, upstairs, in the County jail area. He was talking to me about the crimes that I had committed; he was interrogating me, so-to-

speak, and I noticed a warrant on his desk—on Jack Miller's desk, it was for Scott Rovang, a Class B felony and I started talking to him about it and it went—I asked him if they were going to bring Scott back from California and they said, 'Yes, we are going to get him,' and stuff like this. He had told me that he had talked to Seher, Mr. Seher and Mr. Ronngren, and he said, 'They should go out and get ahold of Scott Rovang and do anything they please to him, hit him; or whatever, and he wouldn't bring any charges against them.' He sent them out, more or less, is what he told me; the way I took it is he sent them out to go ahead and get the information from him and bring it back to him."

with Ronngren and Seher. This confrontation lasted approximately 15 minutes. Rovang initially denied his involvement in the burglary of Ronngren's residence. The testimony of Ronngren and Seher at the suppression hearing reflects that Rovang ultimately admitted his involvement in the burglary of Ronngren's residence. According to Ronngren's and Seher's suppression hearing testimony, after Rovang admitted his involvement in the burglary, they told him they were going to take him to the Jamestown police department. They further testified that Rovang then ran away from them and they chased him, caught him, and took him to the police department.

According to Rovang's testimony at the suppression hearing, he did not admit to his involvement in the burglary before he began to run, and the reason he ran was because he was hit by Seher. Rovang testified that Seher chased him when he began to run and that when Rovang finally stopped running, Seher told him to get on his knees on the boulevard and that at this time he [Rovang] admitted to his involvement in the burglary at Ronngren's residence. Rovang also testified that he was taken to the Jamestown police department so that he could tell Detective Okerlund about the burglary. Rovang testified that Seher told him, "You had better tell him [Okerlund] exactly like you told us. You had better tell it to him or I will knock the crap out of you."

The record reflects that Seher had a knife in a sheath on his belt and that he removed the knife and gave it to Ronngren before he (Seher) gave Rovang a ride to the police department. The record is not clear and it is disputed as to whether or not the knife was waved at Rovang in a threatening manner.

Ronngren, Seher, and Chris Brown took Rovang to the Jamestown police department to see Detective Okerlund. The record reflects that prior to being given the Miranda warnings[5] Rovang had "blurted out" an admission of guilt, and that Detective Okerlund then gave Rovang the Miranda warnings. Rovang testified that he told Okerlund what had happened and that he was frightened of Ronngren and Seher. Okerlund took Rovang to his office and Rovang confessed to Okerlund and North Dakota Crime Bureau Agent Dick Olson. That confession was recorded on a tape recorder.

Rovang testified at the suppression hearing as follows concerning his confession to Oklerund at the Jamestown police department:

"Q. During this time that you were talking with Okerlund and made a confession, was Ronngren and Seher on your mind?

"A. Yes, sir.

"Q. Did you express to Okerlund in any way · the fact they were on your mind?

"A. Yes, sir, I did. When they read me the first part of my rights, one of the parts in there, it says that you are not being forced into saying anything and I said, 'Yes, I am being forced' and then Okerlund busted in, 'But not by us.'

"Q. What did you say?

"A. I said, 'Yes, not by you.' I made it clear I was being forced.

"Q. When you made the confession to the police where did you think Seher and Ronngren were?

"A. I figured they were up in the parking lot waiting for the outcome to see what I had said, if I had lived up to their expectations."

Okerlund testified at the suppression hearing that Rovang signed a Miranda waiver of rights prior to confessing to the crime at the Jamestown police department. Okerlund also testified that he did not threaten Rovang in any way prior to the confession. Okerlund also testified that prior to confessing, Rovang said, "I want to

---

5. "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney either retained or appointed." *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706–707 (1966).

tell you about Ronngren's burglary because these guys—I am scared of these two guys."

After Rovang's motion to suppress the statements made to Ronngren and Seher and the confession to the law enforcement personnel was granted in part and denied in part, Rovang further moved to suppress the confession at the police department or, in the alternative, to dismiss the criminal complaint because his attorney was not allowed to listen to the tape recording of that confession. The tape recording of Rovang's confession apparently had been inadvertently erased after it was transcribed to a typewritten copy. The district court[6] denied Rovang's motion and Rovang, after a bench trial, was convicted of burglary. He appealed to this court.

The first issue raised by Rovang was that his confession to law enforcement personnel should have been suppressed on the grounds that it was involuntary.

Initially we note that Rovang's confession to the private individuals, Ronngren and Seher, was suppressed by the trial court. No appeal has been taken from the trial

6. This motion was decided by the Hon. John T. Paulson.

7. The United States Supreme Court case, *Schneckloth v. Bustamonte,* 412 U.S. at 225–227, 93 S.Ct. at 2047, contains the following discussion of some of the considerations to determine whether or not a confession is voluntary:

"This Court's decisions reflect a frank recognition that the Constitution requires the sacrifice of neither security nor liberty. The Due Process Clause does not mandate that the police forego all questioning, or that they be given carte blanche to extract what they can from a suspect. 'The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.' *Culombe v. Connecticut, supra,* 367 U.S. [568], at 602, 81 S.Ct. [1860], at 1879 [6 L.Ed.2d 1037].

court's decision to suppress those statements. We need not consider the legal issues concerning those statements and we accept the suppression of those statements as only one of the facts in the record before us. However, we take the earlier confession into account as part of the scenario of the matters under consideration.

■ A confession must be voluntary in order to be admissible into evidence at a criminal trial. *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, 1 A.L. R.2d 1205 (1964); *Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936); *State v. Whiteman,* 67 N.W.2d 599 (N.D. 1954); *State v. Nagel,* 75 N.D. 495, 28 N.W.2d 665 (1947).

■ Whether or not a confession is voluntary must be determined under the totality of the circumstances. *State v. Roquette,* 290 N.W.2d 260 (N.D.1980).

There is no talismanic definition of "voluntariness" applicable to the different situations where the question has arisen. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).[7]

"In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused, *e.g., Haley v. Ohio,* 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224; his lack of education, *e.g., Payne v. Arkansas,* 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975; or his low intelligence, *e.g., Fikes v. Alabama,* 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246; the lack of any advice to the accused of his constitutional rights, *e.g., Davis v. North Carolina,* 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895; the length of detention, *e.g., Chambers v. Florida* [309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716], *supra;* the repeated and prolonged nature of the questioning, *e.g., Ashcraft v. Tennessee,* 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192; and the use of physical punishment such as the deprivation of food or sleep, *e.g., Reck v. Pate,* 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948. In all of these cases, the Court determined the factual circumstances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted. *Culombe*

The standard of review which we employ when considering the totality of the circumstances is "whether or not a determination of voluntariness is manifestly against the weight of the evidence ...." *State v. Roquette,* 290 N.W.2d at 264.

■ Our review of the record leads us to conclude that the trial court's determination that the confession by Rovang to the law enforcement personnel was voluntary is manifestly against the weight of the evidence.

Although the suppression of Rovang's statements to Seher and Ronngren is not an issue before us, and we express no opinion on that determination, it is apparent that the factual situation leading up to those statements had some bearing on Rovang's confession to law enforcement personnel. The testimony of Ronngren, Seher and Chris Brown reflects that Rovang, to some degree, was frightened and scared during both confrontations with Ronngren and Seher. The record reflects that Seher was shouting during both of the confrontations. Detective Okerlund gave the essentially uncontradicted testimony that Rovang said "I want to tell you about Ronngren's burglary because these guys—I am scared of these two guys." These circumstances indicate Rovang's fears and apprehensions carried over from his confrontations with Seher and Ronngren to his confession at the police department, and the influence which induced the original statements to Seher and Ronngren was not removed.

The record also reflects that Rovang's confession at the police department was within a matter of minutes of his statements to, and the confrontations with, Seher and Ronngren. Although it is true that Rovang was given his *Miranda* warnings prior to the taped confession to the law enforcement personnel, that fact alone does not make the confession voluntary. See footnote 7, *supra.* Rather, we must look to the totality of the circumstances, and must look to the atmosphere surrounding the confession to the law enforcement personnel and the lack of intervening circumstances between that confession and the confrontations with Seher and Ronngren.

The record does not reflect that when Rovang told the police officer he was "scared of these two guys" the officer gave Rovang any assurances of protection from harm and that the police officer was only interested in the truth.

Based on these factors, we believe the trial court's determination that the confession to the law enforcement personnel was voluntary is manifestly against the weight of the evidence and, accordingly, we reverse the judgment of conviction and remand the case for new trial, or other appropriate proceedings.

ERICKSTAD, C.J., VANDE WALLE, and PEDERSON, JJ., and MICHAEL O. McGUIRE, District Judge, concur.

McGUIRE, D.J., sitting in place of PAULSON, J., disqualified.

*v. Connecticut, supra,* 367 U.S., at 603, 81 S.Ct., at 1879.

"The significant fact about all of these decisions is that none of them turned on the presence or absence of a single controlling criterion; each reflected a careful scrutiny of all the surrounding circumstances. See *Miranda v. Arizona,* 384 U.S. 436, 508, 86 S.Ct. 1602, 1645, 16 L.Ed.2d 694 (Harlan, J., dissenting); *id.,* at 534–535, 86 S.Ct., at 1659–1660 (White, J., dissenting). In none of them did the Court rule that the Due Process Clause required the prosecution to prove as part of its initial burden that the defendant knew he had a right to refuse to answer the questions that were put. While the state of the accused's mind, and the failure of the police to advise the accused of his rights, were certainly factors to be evaluated in as-

sessing the 'voluntariness' of an accused's responses, they were not in and of themselves determinative. See, *e.g., Davis v. North Carolina, supra; Haynes v. Washington, supra,* 373 U.S. [503], at 510–511, 83 S.Ct. [1336], at 1341–1342 [10 L.Ed.2d 513]; *Culombe v. Connecticut, supra,* 367 U.S., at 610, 81 S.Ct., at 1883; *Turner v. Pennsylvania,* 338 U.S. 62, 64, 69 S.Ct. 1352 [1353], 93 L.Ed. 1810."

As to the effect of intervening time and extenuating circumstances, see *State v. Carlson,* 318 N.W.2d 308 (N.D.1982).

The giving of the *Miranda* warnings does not per se make the statements admissible as being voluntary. *Brown v. Illinois,* 422 U.S. 590, 45 L.Ed.2d 416, 95 S.Ct. 2254 (1975).

*See also, Taylor v. Alabama,* —— U.S. ——, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982).