**STATE of North Dakota, Plaintiff and Appellee,**

v.

**Brandon ELLVANGER, Defendant and Appellant.**

**Cr. No. 890144.**

Supreme Court of North Dakota.

March 28, 1990.

Wade G. Enget (argued), State's Atty., Stanley, for plaintiff and appellee. Appearance by William E. Woods, Jr., Sp. Asst. State's Atty.

Farhart, Lian, Maxson, Howard & Sorensen, P.C., Minot, for defendant and appellant; argued by Brenda M. Zent.

MESCHKE, Justice.

Brandon Ellvanger appealed from jury convictions of manslaughter and attempted manslaughter, from denial of his motion for acquittal, and from denial of his motions for a new trial. We rule that admissions by an intoxicated and unrepresented juvenile should not have been used as evidence. We reverse and remand for a new trial.

After school on November 25, 1987, fifteen-year-old Brandon Ellvanger checked his trap line around the farm where he lived with his father, Gregory Ellvanger. Sometime after 9 p.m., Brandon left the farm and visited with his grandfather, Floyd Ellvanger, for about half an hour in a Stanley restaurant. Brandon left the restaurant intending to go home and check his traps again.

Instead, Brandon met two friends, James Kyllonen and John McGinnity. They drove around Stanley and drank beer. They later went to a party in Palermo, where Brandon continued drinking alcoholic beverages. Brandon did not recall leaving the party. The next thing Brandon recalled was pain in his back and hearing his father order him to get out of bed and to go outside.

Brandon's father, Gregory Ellvanger, returned home after a truck-driving trip, about 4:30 a.m. on November 26, 1987. Gregory found two people sleeping in a car that he did not recognize. After unsuccessfully attempting to awaken. the driver of the car, Gregory entered the house. Gregory struck Brandon on the back, awakened him, and ordered him to get dressed and to go outside.

Gregory · went outside again and awakened the driver of the car, James Kyllonen. While Gregory and Kyllonen were arguing, Brandon came outside with a semi-automatic .22 rifle slung over his shoulder. Gregory started toward Brandon and yelled at him in a loud voice. Brandon responded by talking about his traps. Kyllonen also started walking toward Brandon. Gregory turned his back on Brandon when he was about five feet away. Gregory heard the sounds of a scuffle and shots. He ran toward Brandon and disarmed him. Kyllonen was killed and Gregory was wounded.

Brandon was charged with murder and attempted murder. Prosecution of the offenses was transferred from juvenile court pursuant to NDCC 27–20–34. The jury convicted Brandon of manslaughter and attempted manslaughter.

Brandon appealed a number of issues. We address only three:

1) Should Brandon's admissions to investigating officers have been used as evidence?
2) Should the trial court have read the charging information to the jury?
3) Was it prejudicial for the trial court to remark, "I'll end up sentencing him."?

Brandon asserted that the trial court erred in denying his motion to suppress statements he allegedly made to law enforcement officials. We agree.

To be admissible evidence at a criminal trial, a confession must be voluntary. *State v. Rovang*, 325 N.W.2d 276, 279 (N.D.1982). "Whether or not a confession is voluntary must be determined under the totality of the circumstances." *Id.* We summarized the relationship of voluntariness, waivers, and *Miranda* warnings in *State v. Newnam*, 409 N.W.2d 79, 83–84 (N.D.1987):

> When a defendant attacks the voluntariness of a confession on due process grounds, the outcome depends on the totality of the circumstances. *State v. Discoe*, 334 N.W.2d 466 (N.D.1983); *State v. Carlson*, 318 N.W.2d 308 (N.D. 1982), *cert. denied* 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 609 (1982). The same approach determines whether a defendant voluntarily, knowingly, and intelligently waived his rights. *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *State v. Carlson, supra.* The prosecution must show waiver by at least a preponderance of the evidence. *Colorado v. Connelly*, [479] U.S. [157], [169], 107 S.Ct. 515, 523, 93 L.Ed.2d 473, 485 (1986). A confession may be involuntary and inadmissible even if police have complied with the *Miranda* requirements. *Miranda v. Arizona* [384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ] *supra.*

Factors to consider in the totality of the circumstances of a confession include "the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep." (Citations omitted.) *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854, 862 (1973). As we recently explained in *State v. Pickar*, 453 N.W.2d 783 (1990), the characteristics and condition of the accused at the time of the confession, as well as the details of the setting in which the confession was obtained are relevant.

■ Additional factors come into play and special concerns are present when the voluntariness of a confession by a juvenile is challenged. As the United States Supreme Court pointed out in *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197, 212 (1979), testing the voluntariness of a juvenile's confession requires "evaluation of the juvenile's age, experience, education, background, and intelligence, and ... whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." A youth's ability to understand is especially important.

■ In *In re Gault*, 387 U.S. 1, 55, 87 S.Ct. 1428, 1458, 18 L.Ed.2d 527, 561 (1967), the Supreme Court held "that the constitutional privilege against self-incrimination is applicable in the case of juveniles as it is with respect to adults" and declared:

The participation of counsel will, of course, assist the police, Juvenile Courts and appellate tribunals in administering the privilege. If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.

Statements by a youngster, unrepresented by counsel, must be scrutinized for voluntariness.

■ The need of children for additional protection has been recognized by our Legislature. NDCC 27–20–26 mandates that "at all stages of any proceedings" under NDCC Ch. 27–20, the Uniform Juvenile Court Act, "[c]ounsel must be provided for a child not represented by his parent, guardian, or custodian." This court applied that provision in *In Interest of D.S.*, 263 N.W.2d 114, 120–121 (N.D.1978):

We conclude, upon a careful examination of § 27–20–26, N.D.C.C., that this section imposes a mandatory duty to provide counsel for a child at all stages of the proceedings under the Uniform Juvenile Court Act providing the child is not represented by his parent, guardian, or custodian. Furthermore, we conclude that this right to counsel cannot be waived by a child who is not represented by his parent, guardian, or custodian. *See, K.E.S. v. State*, 134 Ga.App. 843, 216 S.E.2d 670 (1975). Any other interpretation would be contrary to the clear and unambiguous language of § 27–20–26, N.D.C.C.

Investigational interrogation which focuses on an unrepresented juvenile is a critical stage of a criminal proceeding. *In Interest of J.D.Z.*, 431 N.W.2d 272 (N.D.1988). "[T]he investigation must focus on the individual before the right to counsel applies." *In Interest of M.D.J.*, 285 N.W.2d 558, 562 (N.D.1979). Violation of NDCC 27–20–26 renders a confession inadmissible. *In Interest of J.D.Z., supra.* NDCC 27–20–27 directs: "An extra-judicial statement, if obtained in the course of violation of this chapter or which would be constitutionally inadmissible in a criminal proceeding, shall not be used against" a juvenile.

■ The State argued to us that by acquiescing in transfer of these charges from juvenile court to adult court Brandon gave up all protections mandated by the Uniform Juvenile Court Act, including the right to counsel during interrogational stages under NDCC 27–20–26. Therefore, the State argued, all of Brandon's statements to investigating officers were admissible evidence. This argument is too sweeping. By statute, the only effect of a transfer is to terminate jurisdiction of the juvenile court over the child. NDCC 27–20–34. Transfer to adult court does not retroactively revoke any other right. It remains important that the greatest care has been taken to assure that admissions by a juvenile were voluntary.

When someone claims that a confession made during police interrogation was not voluntary, "it is the duty of an appellate court, ... 'to examine the entire record and make an independent determination of the ultimate issue of voluntariness.' *Davis v. North Carolina*, 384 U.S. 737, 741–742, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895, 898

814

(1966)." *Beckwith v. United States*, 425
U.S. 341, 348, 96 S.Ct. 1612, 1617, 48
L.Ed.2d 1, 8 (1976). Where adequately ex-
plained, we show great deference to a trial
court's determination on voluntariness.
*State v. Larson*, 343 N.W.2d 361 (N.D.
1984); *State v. Discoe*, 334 N.W.2d 466
(N.D.1983). As registered by *State v. Ro-
vang*, 325 N.W.2d at 280, our standard of
review is whether the trial court's determi-
nation of voluntariness is manifestly
against the weight of the evidence.

The trial court held an evidentiary hear-
ing on Brandon's motion to suppress his
statements to law enforcement officials.
Kenneth Halvorson, Mountrail County
Sheriff; Richard Hickman, an investigator
for the North Dakota Bureau of Criminal
Investigation; Floyd Ellvanger, Brandon's
grandfather; and Gregory Ellvanger,
Brandon's father, testified.

Halvorson testified: (1) he arrived at the
Ellvanger home at 5:40 a.m.; (2) he did not
recall Floyd or Gregory saying who shot
Gregory; (3) after Gregory was placed in
the ambulance, he went back into the house
and asked Brandon what had happened; (4)
he asked Brandon what had happened be-
cause Brandon was the only one left who
was there at the time of the shooting; (5)
Brandon's grandfather directed Brandon:
"If you know anything about this, go
ahead and tell him;" (6) when he asked
Brandon what had happened, his investiga-
tion had not focused on Brandon and Bran-
don had not been arrested; (7) as Brandon
was telling him what had happened, Bran-
don said, "I only shot to scare them," and
Halvorson then "stopped and administered
the Miranda rights;" (8) in a second state-
ment, after he had been given his *Miranda*
warnings, Brandon repeated that he "only
shot to scare them" and went on to say
that "The gun kept going off" and when
Halvorson asked, "How many times,"
Brandon replied, "About four, five times;"

and (9) that Dr. Wilson, the County Coro-
ner, then interviewed Brandon in Halvor-
son's presence and got "[b]asically the
same story."

Hickman testified: (1) he arrived at the
Ellvanger home about 7 a.m.; (2) Halvor-
son had called him and told him that Bran-
don had shot Gregory and James; (3) Hal-
vorson told him that Brandon got home
shortly before 5 a.m.; (4) Floyd said it
would be all right if he talked to Brandon;
and (5) he interviewed Brandon for about
15 minutes. Hickman's notes of his inter-
view of Brandon were introduced as an
exhibit. Those notes reflected additional
admissions made by Brandon, which Hick-
man testified to at the trial.

Gregory Ellvanger testified that when
Sheriff Halvorson walked into the house he
told Halvorson that Brandon had shot him.

Floyd Ellvanger testified: (1) he arrived
a few minutes before Halvorson; (2) he
told Halvorson that Gregory "had been
shot and that Brandon had done it;" (3) he
never heard Halvorson read the *Miranda*
rights; (4) Halvorson and Brandon were
never alone together out of his presence;
(5) Brandon was unable to answer ques-
tions—"he just kept weeping, crying, and
he was just like he was in shock and ... his
speech wasn't good;" and (6) "most of the
time he was in a sob and crying and he was
worried about his dad. 'Is dad going to be
all right? Dad going to be all right?'
That's all it seemed he could say."

After hearing the testimony, the trial
court summarily denied Brandon's suppres-
sion motion without explanation, stating
that "the request is denied."

■ The trial court did not make a find-
ing as to whether or not Halvorson's inves-
tigation had focused on Brandon before he
made the first statement to Halvorson.[1] It
is beyond dispute that Brandon's later

1. In *In Interest of M.D.J., supra*, a police officer
entered a home in response to a report of a
shooting. He met M.D.J. "just inside the back
door" and asked him, "Where are your parents?"
285 N.W.2d at 560. "M.D.J. replied, 'They are
upstairs.' He paused and then added, 'I shot
them.'" *Id.*, at 560. This court held that the
officer's question was not an investigation and

that "[t]here was no 'investigation' that focused
on any particular person at that time." *Id.*, at
562. Unlike M.D.J.'s statement, Brandon's ini-
tial statement was not an "unsolicited response."
*Id.*, at 562. Upon remand, the trial court must
determine whether Sheriff Halvorson had fo-
cused his investigation on Brandon with his
initial question.

statements to Halvorson and to Hickman were made after the investigation had focused on him. Brandon was not represented by a parent, guardian, or custodian during his interrogation and could not waive his statutory right to counsel. Because he was not represented by a parent, guardian, or custodian, and he did not have counsel, Brandon was denied his right to counsel under NDCC 27–20–26. *In Interest of D.S., supra.* If Sheriff Halvorson had already been told that Brandon had done the shooting when the first question was asked of Brandon, it would appear that the investigation had focused on Brandon and that his first statement would not be admissible evidence. In any event, Brandon's later statements were not admissible evidence and should have been suppressed.

■ An intoxicated [2] fifteen-year-old boy who may or may not have been given his *Miranda* warnings was repeatedly interrogated by officers in early morning hours; he had had little sleep in the preceding 24 hours; he was experiencing the shock of the death of a friend and the wounding of his father; he was not represented by a parent, guardian, or custodian; he was denied his right to counsel mandated by NDCC 27–20–26, which he did not waive; and his grandfather, the only relative present when he was being questioned by Sheriff Halvorson, ordered him: "If you know anything about this, go ahead and tell him." The trial court's determination of voluntariness was manifestly against the weight of the evidence.

■ We conclude from our examination of the totality of these circumstances that nearly all, if not all, of the admissions Brandon made to the investigating officers were involuntary. In our view, Brandon's alleged admissions were likely "the product of ignorance of rights or of adolescent fantasy, fright or despair." *In re Gault, supra,* 387 U.S. at 55, 87 S.Ct. at 1458, 18 L.Ed.2d at 561. We conclude that Brandon's admissions, after his answer to Halvorson's first question, were inadmissible

and that the trial court erred in denying his motion to suppress. Brandon's first admission may also have been inadmissible. Therefore, we reverse the judgment of conviction.

■ Brandon contended that he did not have a fair trial because the trial court read the charging information to the jury. He argued this was a violation of NDCC 29–21–01(1) which instructs:

If the information or indictment is for a felony, the clerk or state's attorney must read it, and must state the plea of the defendant to the jury. In all other cases this formality may be dispensed with.

An irregularity which justifies a new trial is one which prevents a party from having a fair trial. "[A] defendant is entitled to a fair trial but not necessarily to a perfect trial." *State v. Allen,* 237 N.W.2d 154, 162 (N.D.1975). We are not persuaded that the inadvertent reading of the information by the trial court, rather than by the clerk or state's attorney, prevented Brandon from having a fair trial.

But the trial court's effort to cure that irregularity was unfortunate. After both sides rested, counsel for Brandon requested that the trial court advise the jury that the court's reading of the information did not mean that the court was taking a position. The court acted by advising the jury:

Incidentally, at the outset, well, when I gave you the preliminary instructions, I read to you the Information. The mere fact that I did that doesn't mean to infer that I feel one way or the other about the guilt or the innocence of this young man of any of these charges—crimes charged. You folks are the trier of the facts. That's your decision to make. I'll give you the law and I'll end up sentencing him, but it's your job to decide that issue. Okay. Thank you.

Brandon contended that "the Judge's statement that he would 'end up sentencing him' indicated to the jury an inference that the Defendant was guilty."

2. The Mountrail County coroner drew a blood sample from Brandon at 6:30 a.m. on November 26, 1987. Analysis of the specimen showed that

Brandon had a blood alcohol concentration of .21 per cent by weight.

**816**

Brandon may have been prejudiced by the judge's statement that he would "end up sentencing him." That prediction of the result may well have led jurors to believe that the judge thought that Brandon was guilty. "[J]urors are quick to be influenced by any opinion that they think the trial judge harbors about the merits of the case or the weight of certain evidence." *State v. Yodsnukis,* 281 N.W.2d 255, 262 (N.D.1979). Because of our reversal and remand for other reasons, we need not decide whether the trial court's statement that he would "end up sentencing him" was reversible error.

"Questions, the answers to which are not necessary to the determination of a case, need not be considered." *Hospital Services, Inc. v. Brooks,* 229 N.W.2d 69, 71 (N.D. 1975). Therefore, we deem it unnecessary to consider any of the other issues raised.

On remand, the trial court must resolve the conflict in the evidence as to whether Sheriff Halvorson had been told that Brandon had done the shooting and must determine whether the investigation had focused on Brandon when Brandon answered the sheriff's first question. If the investigation had focused on Brandon before Sheriff Halvorson's first question, Brandon's first admission must be suppressed as well as his later admissions.

The judgment of conviction is reversed and the matter is remanded for further proceedings and for a new trial.[3]

ERICKSTAD, C.J., and LEVINE, VANDE WALLE and GIERKE, JJ., concur.

---

**3.** Brandon was tried on charges of murder and attempted murder, but was convicted of the lesser offenses of manslaughter and attempted manslaughter. Because he was implicitly acquitted of the greater charges by conviction of the lesser offenses, the new trial resulting from his successful attack of his conviction of those lesser offenses cannot include the greater charges. Retrial of those greater charges is barred by the double jeopardy clause. *See Price v. Georgia,* 398 U.S. 323, 90 S.Ct. 1757, 26 L.Ed.2d 300 (1970); *Green v. United States,* 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957); 22 C.J.S. *Criminal Law* § 251 (1989).