1999 ND 28

**STATE of North Dakota, Plaintiff and Appellee,**

**v.**

**Mark C. OSIER, Defendant and Appellant.**

**Criminal No. 980088.**

Supreme Court of North Dakota.

Feb. 23, 1999.

 

Wade L. Webb, Assistant State's Attorney, Fargo, ND, for plaintiff and appellee.

Marc G. Kurzman (argued), of Kurzman, Grant & Ojala, Minneapolis, MN, moved for admission by Thomas M. Tuntland (appeared), Mandan, ND, on behalf of Mark A. Beauchene, Fargo, ND, for defendant and appellant.

MARING, Justice.

[¶ 1] Mark C. Osier has appealed from a criminal judgment entered upon jury verdicts finding him guilty of gross sexual imposition. We affirm.

[¶ 2] The State charged Osier with six counts of gross sexual imposition in violation of N.D.C.C. § 12.1–20–03(1)(d) for engaging in sexual acts with a victim less than fifteen years old. Count 1 alleged Osier engaged in sexual acts with his minor daughter from January 1994 through June 1994. Counts 2 through 6 alleged Osier engaged in sexual acts with his daughter in the months of July through November, 1994.

[¶ 3] A jury found Osier guilty on all six counts. This Court reversed and remanded for a new trial because of an error in the admission of evidence. *State v. Osier*, 1997 ND 170, 569 N.W.2d 441. After a new trial, the jury found Osier not guilty on Count 1, and guilty on Counts 2 through 6. The trial court denied Osier's motion for a new trial and entered a criminal judgment and commitment. Osier appealed.

I

[¶ 4] Osier has raised two issues about the trial court's refusal to allow introduction of evidence about the complainant's prior sexual behavior. He argues the trial court erred in prohibiting the introduction of evidence about the complainant's prior sexual behavior, which he asserts "would have provided an explanation for the physical findings noted by the examining physician who testified on behalf of the state." He also contends the trial court erred in prohibiting the introduction of evidence about "statements made by the state's immunized witness, . . . who, when he was being questioned by investigators for the state and the defense; disclosed his numerous and varied sexual contact with" the complainant.

[¶ 5] Relevant evidence is evidence that "would reasonably and actually tend to prove or disprove any matter of fact in issue." *State v. Buckley*, 325 N.W.2d 169, 172 (N.D.1982). We will not overturn a trial court's admission or exclusion of evidence on relevance grounds unless the trial court abused its discretion. *State v. Clark*, 1997 ND 199, ¶ 26, 570 N.W.2d 195. " 'A trial court abuses its discretion when it acts in an arbitrary, unreasonable, or unconscionable manner, or when its decision is not the product of a rational mental process.' *Anderson v. A.P.I. Co. of Minnesota*, 1997 ND 6, ¶ 18, 559 N.W.2d 204." *In re Lukens*, 1998 ND 224, ¶ 12, 587 N.W.2d 141. "[T]he scope of cross-examination is a matter within the trial court's discretion." *State v. Neufeld*, 1998 ND 103, ¶ 24, 578 N.W.2d 536.

[¶ 6] Ordinarily, in a trial for gross sexual imposition in violation of N.D.C.C. § 12.1–20–03(1)(d), when a prosecutor has introduced medical evidence of a youthful complainant's physical condition, the defendant should be "allowed to 'provide an alternative explanation for her physical condition' by cross-examining the complainant about her 'prior sexual activity tending to show that another person might have been responsible for her condition.' " *State v. Reinart*, 440 N.W.2d 503, 505 (N.D.1989), quoting *People v. Mikula*, 84 Mich.App. 108, 269 N.W.2d 195, 198 (1978). When the prosecution introduces medical evidence to establish penetration, evidence of alternative sources of penetration becomes "highly relevant to the crucial issue in dispute." *Reinart*, 440 N.W.2d at 506. That right of cross-examination is limited, however:

> It is clear from this statute [N.D.C.C. § 12.1–20–14(2) ], evidence of a complaining witness's sexual conduct may be brought up in cross-examination only when the prosecution has first introduced the evidence, and then only by limited rebuttal. Section 12.1–20–15, N.D.C.C., requires the defense to move in writing in advance of trial, if evidence of sexual conduct is to be used to attack the credibility of the complaining witness. No such motion was made here.

*State v. Neufeld*, 1998 ND 103, ¶ 27, 578 N.W.2d 536.

[¶ 7] The complainant's sexual activity or possible sexual activity was addressed a number of times during the trial. In his opening statement, Osier's counsel said: "The evidence is going to show you that when [the complainant] was 13 she was living

in an apartment complex and in that summer, the summer of '94, she started up with an 18–year–old [young man]. They had a sexual relationship." At trial, the complainant testified that, in a deposition, she said she had not had sex with anyone other than her father, but, she testified at trial, she had had sexual intercourse with the young man "[o]nce and the act wasn't finished.... He did not ejaculate. It was only a few strokes."

[¶ 8] Out of the presence of the jury, Osier's attorney advised the court he wished to question the complainant about other sexual activity:

> The second issue I wanted to address with the Court is in my cross-examination of [complainant] today I did want to go a little bit more in detail into her sexual activity with [the young man]. The extent to which I wish to go into said detail is that according to [his] testimony at the last trial approximately one week before there was pen[ile] intercourse with [complainant] between [he] and [complainant, complainant] engaged in fellatio upon him putting her mouth on his penis. The significance thereafter is that when [complainant] was finally confronted with the fact that everybody knew about [the young man] and she was still denying it she then claimed that there was only one occasion where anything did happen whatsoever.
>
> That's the full extent I wanted to go into in regard to other sexual activity....

The prosecutor objected, claiming Osier's pretrial motion was insufficient because it was not accompanied by an affidavit stating Osier's offer of proof of the relevancy of evidence of the complaining witness's sexual conduct, as required by N.D.C.C. § 12.1–20–15. Osier's attorney informed the court an affidavit was filed with a motion before the first trial. The court ruled: "For purposes of this record, I insist that a new—if there is—if there is to be an offer of proof under 12.1–20–15, that you comply with the statute fully again." With a new trial, a new prosecutor, and a new judge, we conclude the trial court did not abuse its discretion in requiring a new motion and affidavit in accordance with N.D.C.C. § 12.1–20–15.

[¶ 9] Osier also sought to examine the young man about his sexual acts with the complainant. The young man testified he had sexual intercourse with the complainant once. On cross-examination, the following colloquy occurred:

> Q. Had you any sexual contact of any other type with [the complainant] to this day?
>
> MR. ALBRIGHT: Objection, Your Honor, relevance.
>
> THE COURT: Sustained.
>
> MR. KURZMAN: Your Honor, I would like to make an offer of proof at the bench. I'll do it in front of the jury on relevance if the Court wants.
>
> THE COURT: Offer of proof can be made at recess in the courtroom.

The young man also testified he had told investigators of other sexual acts he was involved in with the complainant.

[¶ 10] At a recess, Osier's attorney made the following offer of proof:

> MR. KURZMAN: With regard to the relevance, we believe that the multiple acts of sexual contact between [the complainant] and [the young man] are relevant insofar as I guess Dr. Miller is here but during his testimony Dr. Miller indicated at the last trial that the hymen was worn away and allowed to say how that could have worn away by pen[ile] insertion as well as digital finger insertion. The police report—Detective Wawers indicated that [the young man] said that he had finger—digital penetration as well as the oral copulation as well as the sexual act and these took place at different times. Therefore, the additional contact which could account for the disappearance of the hymen or at least one of the factors is relevant to issues in this case and should be subject to review by the jury. Thank you, Judge.

[¶ 11] Dr. Ron Miller, a pediatrician, examined the complainant on November 30, 1994. Dr. Miller testified about the result of the examination:

> This would be considered a non-virginal exam. The hymen was fairly well worn away and the opening of the vagina was

significantly larger than would normally be seen.

When asked if he had "develop[ed] a professional opinion after [the complainant's] exam whether she had been involved in sexual intercourse," Dr. Miller testified:

> A. Well, some type of intercourse was involved here to produce this and so, yes, my opinion is that she's probably had intercourse on many occasions. It is not likely that one occasion would do this. Could several do it? Yes, possibly. Is it many more than several? Clinically this would be what would be commonly seen, for example, in a 20–year–old woman who's been married for two years who had intercourse regularly.

Dr. Miller testified "[i]t would take many; probably more than several" acts of "pen[ile]/vaginal intercourse" to "produce this type of physical finding."

[¶ 12] Dr. Miller testified on cross-examination:

> Q. Doctor, if [the complainant's] vagina had been penetrated with a finger, either her own or somebody's finger, could that erode the hymenal tissue?
>
> A. Multiple episodes of multiple digital intercourse could erode the tissue.
>
> Q. And that would also be true with masturbatory behavior? If she was engaged in self-masturbatory behavior that might wear away the tissue, correct?
>
> A. Masturbatory behavior, using a finger or some type of instrument, would produce the same type of findings as pen[ile] intercourse.

Dr. Miller testified he did not ask the complainant if "she was involved in any masturbatory behavior," if she "or others put their fingers in her vagina," or if "she used vibrators, any other instruments to insert into her vagina."

[¶ 13] We have held an error in sustaining a prosecutor's objection to repetitive testimony about a complainant's prior sexual activity may be harmless if a defendant "placed before the jury ample evidence and argument attempting to suggest the possibility of someone else being responsible for the complainant's physical condition." *State v. Weather-*

*spoon,* 1998 ND 148, ¶ 15, 583 N.W.2d 391. As the foregoing evidence shows, although his cross-examination of the complainant about her sexual activity was limited by the trial court, Osier was able to suggest to the jury a person other than he may have been responsible for the complainant's physical condition.

[¶ 14] Under N.D.R.Ev. 103, "[e]rror may not be predicated upon a ruling which . . . excludes evidence unless a substantial right of the party is affected, and . . . the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." One of the touchstones for an effective appeal on any proper issue is that the matter was appropriately raised in the trial court so it could intelligently rule on it. *Beavers v. Walters,* 537 N.W.2d 647, 652 (N.D. 1995); *State v. Neset,* 216 N.W.2d 285 (N.D. 1974). The Explanatory Note to N.D.R.Ev. 103 "clearly directs the parties to create a record which will permit informed appellate review." *Gorsuch v. Gorsuch,* 392 N.W.2d 392, 394 (N.D.1986).

[¶ 15] Osier provided the trial court with offers of proof, but those offers of proof did not indicate he would be able to show sexual activity with the young man of a kind and degree sufficient to cause the physical condition observed by Dr. Miller in examining the complainant—"what would be commonly seen, for example, in a 20–year–old woman who's been married for two years who had intercourse regularly."

[¶ 16] Osier's counsel told the court he wanted to go into the complainant's sexual activity with the young man because of his testimony in an earlier trial that a week before they had intercourse, "[the complainant] engaged in fellatio upon him putting her mouth on his penis," which counsel deemed significant, because the complainant had "claimed that there was only one occasion where anything did happen whatsoever." Thus, Osier wanted to delve into that matter to impeach the complainant's credibility. However, the impeachment value of that incident was merely cumulative of abundant evidence that the complainant had repeatedly

lied to protect the young man. She testified she had wanted to protect him. She testified she told an investigator she had not had sex with anyone other than her father so the young man "wouldn't get in trouble." On cross-examination, the complainant testified that, each time she was asked if she "ever had sex with anybody [she] denied having sex with anybody other than [her] father" because she "didn't want [the young man] to get in trouble." On cross-examination, the complainant said she had lied to doctors about whether she had had sex with anyone. She answered "Yes" to the following question on cross-examination: "Q. So it's fair to say that you kept lying until somebody had some physical evidence to show you were lying and then you changed the story?" We conclude the trial court did not abuse its discretion in excluding additional evidence of sexual activity by the complainant.

## II

[¶ 17] Osier contends the trial court erred in prohibiting examination of the complainant and Karen Baker about statements made by the complainant, which Baker interpreted as evidencing hallucinations and confusing reality with dreams. Osier argues "the jury was left without significant information to conclude that [the complainant] was either a liar or suffered from a psychological illness which caused her to make up the stones [sic] about her father."

[¶ 18] On cross-examination, the complainant testified she "had flashbacks," she had not "claimed to have heard things that other people didn't hear," and she had never "confused dreams with reality." Osier sought to call Baker to identify an exhibit containing notes made by Baker during a conversation with the complainant. The State objected. The trial court concluded the evidence was irrelevant:

THE COURT: I really have a hard time with this. These are all conversations that took place after the incidents.

MR. KURZMAN: That's correct, Your Honor, because she relates both visual and audio hallucinations. That is something which this jury has a right to know. This is January 20, 1995. Within a month—I'm

sorry, within [ ] weeks of her coming up with the story which has brought us all together here today and when she was asked whether she has hallucinations she responded by saying, Oh, well, sometimes I have flashbacks, which leave the jury believing that maybe she was so traumatized by the rape that she is flashing back being raped by her father which is not in fact the subject. If she is a person who has auditory and visual hallucinations, the relevance of that goes to whether or not the jury in hearing her testimony should give such weight to that testimony as they would to a witness who doesn't admit to visual and audio hallucinations. It's a statement against it and would be admissable under that exception as notwithstanding that testimony be hearsay. We believe it is admissable and relevant as is the business record exception. In light of the answers that she gave, it also serves to have the potential of impeaching her. Thank you.

MR. ALBRIGHT: Our specific—

THE COURT: I have reviewed—I have reviewed the documents. There is no probative value to visual and audio hallucinations. The document clearly shows me that it's the questioner who did—who—who made the determination that it may have been a hallucination. It does not relate to any conversations of the witness describing hallucinations in those terms. It's just not relevant.

[¶ 19] "The test to determine whether evidence is relevant or irrelevant is whether the evidence would reasonably and actually tend to prove or disprove any matter of fact in issue." *State v. Buckley*, 325 N.W.2d 169, 172 (N.D.1982). "In actions involving sex crimes, the complainant is not the person being tried. The proceedings should not put the complaining witness on trial to shift the attention away from the accused." *Id.*, 325 N.W.2d at 171. Osier did not present the trial court with an offer of proof showing the complainant's "psychiatric condition (or lack of psychiatric condition) affected her ability to truthfully relate the incident." *Id.* at 172. The trial court found the references to hallucinations were made by Baker

and were not relevant. We are not persuaded the trial court abused its discretion in excluding evidence about statements the complainant may have made to Baker.

## III

[¶ 20] Osier contends the verdicts were inconsistent because the jury found him not guilty on Count 1 and guilty on Count 2 through Count 6. Osier contends the difference in verdicts "is inconsistent with any conclusion other than the jury reached a 'compromise' verdict, or misunderstood the court's jury instructions, or that the verdict was tainted by the extrajudicial publicity which blanketed the area where the jurors returned to their homes after selection during the trial."

[¶ 21] Count 1 charged Osier with engaging in sexual acts with a person under 15 years of age from January 1994 through June 1994. Counts 2 through 6 each charged Osier with engaging in sexual acts with a person under 15 years of age in the months of July, August, September, October, and November, 1994, respectively.

[¶ 22] The difference in verdicts is easily explained by evidentiary differences. A calendar in evidence indicated dates when the complainant asserted Osier engaged in sexual acts with her as charged in Counts 2 through 6, but not for the months charged in Count 1. Also, the personnel manager of Osier's employer testified and produced an exhibit showing the hours when Osier and his wife worked. He analyzed when they worked from July 16, 1994, through November 1994, but not earlier. Osier's argument is without merit.

## IV

[¶ 23] Osier has raised two issues about the trial court's refusal to poll the jury about possible exposure to publicity about the case: (1) Whether the trial court erred in refusing to poll the jury about exposure to publicity during the trial; and (2) Whether the trial court's failure to poll the jury deprived him of the ability to support a motion for mistrial.

[¶ 24] Ordinarily, the matter of the fairness and impartiality of jurors subject to news articles about the trial is left largely to the discretion of the trial court. *State v. Voeller*, 356 N.W.2d 115, 118 (N.D.1984). A trial court is not required to "poll the jury in every instance in which a claim of prejudicial news accounts is made. 'Unless there is *substantial reason to fear prejudice*, the trial judge may decline to question the jurors.' " *Id.* at 120, quoting *United States v. Jones*, 542 F.2d 186, 194 (4th Cir.), *cert. denied*, 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976). "In the absence of contrary evidence, a presumption exists that a jury performed its duties in accordance with the law and were not influenced by outside events or evidence." *Voeller*, 356 N.W.2d at 121. "A jury is presumed to follow instructions provided by the court." *State v. Asbridge*, 555 N.W.2d 571, 575 (N.D.1996). "We must assume, absent acceptable proof to the contrary, that the jury followed the instructions given by the trial judge." *State v. Breding*, 526 N.W.2d 465, 472 (N.D.1995). " '[A] defendant is entitled to a fair trial but not necessarily to a perfect trial.' " *State v. Ellvanger*, 453 N.W.2d 810, 815 (N.D.1990), quoting *State v. Allen*, 237 N.W.2d 154, 162 (N.D.1975).

[¶ 25] "We review a district court's decision not to conduct a voir dire of the jury regarding their possible exposure to mid-trial publicity for an abuse of discretion." *United States v. Hall*, 152 F.3d 381, 421 (5th Cir.1998). The trial court must determine if the publicity was innately prejudicial, the likelihood the publicity reached the jury, and whether the jurors would be sufficiently influenced by the court's instructions to disregard the publicity. *Id.* After noting the trial court repeatedly admonished the jury to avoid media coverage of the trial, the court in *Hall* upheld the trial court's refusal to poll the jury about exposure to a television news broadcast about the trial:

Given the court's admonition, it is unlikely that any of the jurors saw any portion of the broadcast in question. Moreover, any juror who happened to see the beginning of the broadcast likely would have, pursuant to the court's instructions, turned off

the television before the prejudicial portion of the broadcast commenced. In sum, we conclude that the district court did not abuse its discretion in concluding that the likelihood that the jury was exposed to the prejudicial portion of the broadcast was sufficiently low that voir dire of the jury was not warranted.

*Id.* This Court has also referred to a trial court's admonitions about publicity when addressing possible jury exposure to media coverage:

> The trial court clearly and repeatedly admonished the jury during the trial not to read about the case in newspapers or listen to or view news accounts of the trial on television or radio. In the absence of contrary evidence, a presumption exists that a jury performed its duties in accordance with the law and was not influenced by outside events or evidence. *State v. Voeller, supra*, at 121; *State v. Olson*, 274 N.W.2d 190, 193 (N.D.1978). Ohnstad's conviction was not obtained in a trial atmosphere utterly corrupted by press coverage, from which we could presume unfairness of a constitutional magnitude.

*State v. Ohnstad*, 359 N.W.2d 827, 842 (N.D. 1984).

[¶ 26] Here, immediately after the jurors were sworn in, the trial court instructed them:

> And when you go home at night or at noon recesses, don't put yourself in a position where you're discussing it with anybody or if you should happen to see—refrain from putting yourself in a position where you're watching it on TV. It may be—I don't know what the media will do with this trial, but try to refrain from watching news accounts about anything in the next few days. That's what I would do personally.
>
> Don't make up your mind about the outcome of this case until you've heard all the evidence, the closing arguments of counsel, and my closing instructions on the law which I will give you at the end of this case and you have retired to the jury room to make up your mind to make up a decision. So it's at that point that you want to make up your mind about the outcome of this case.

[¶ 27] At the end of the first day of trial, the court instructed the jury: "Members of the jury, we will be in recess until nine-thirty tomorrow morning. Please bear in mind and recall my admonition to you." Before examining any witnesses the next morning, Osier's attorney asked the court to poll the jury about publicity:

> THE COURT: Counsel, you asked for a conference?
>
> MR. KURZMAN: Yes, Your Honor. We had requested an opportunity before the jury comes in to ask the Court to inquire of the individual jury members whether or not they saw any of the news broadcasts which were on Channel 4, 6 and 11, two to three times each station, last night and whether or not they heard any of the radio reports which were on at least two local stations last night and again early this morning.
>
> The reason for the request is that the news reports indicated that this was the third trial. They said the first trial ended up in the hung verdict.
>
> THE COURT: I don't know. I must be living in a vacuum here because I didn't see any of this. Depending on what you say as being accurate, okay—
>
> MR. KURZMAN: Yes, the lead story Channel 4 at five o'clock, the second lead on Channel 11 at five o'clock. It was the second to lead on Channel 6 after the gamed ended. It was on earlier and again later. One of the Channels is Channel 6. I was surfing as men are apt to do and saw that Channel 6 was doing footage of a year ago, an interview of myself and an interview of [the complainant]. I don't know to what extent. I was going back and forth between stations. I don't know if there was anything else presented to the public. I did see a full and complete anchor person and the individuals in the courtroom, there were two of them in the courtroom, also on air where they were discussing that the second trial resulted in a conviction. Channel, I think it was, 11 said that the conviction was overturned because the State used evidence that was illegal to uses under North Dakota law and that was

starting the third trial. They [o]pined as to what the evidence was. They [o]pined as to what the theory would be and what evidence would be presented in the case.

Therefore, we request that the jury be voir dired. If one or more members of the jury did see it, then depending on what they saw and what impressions they had we may have to move for a mistrial.

[¶ 28] The trial court ruled: "As to the media problem, I am going to do nothing right now but do a precautionary instruction to the jury on the recess. Okay." At the next noon recess, the court instructed the jury:

I want to remind you of my admonition to you yesterday relative to not making up your minds about the outcome of this case until you have heard all the arguments and have been instructed on them all; and I further instruct you to not put yourself in a position where you're either talking among yourselves or other people during recesses or adjournments overnight.

If you have any questions about what has transpired in this courtroom, you should direct it to the bailiffs. And in particular you will note that the media is aggressively covering this case as they have a right to do. That's their right. You also have a right and a responsibility to avoid viewing or listening to that media coverage. Any TV footage or statements by reporters whether they're written or oral are not evidence. The evidence that you must use to decide all the questions of fact in this case is that received in the trial through the testimony of the witnesses and the exhibits that are received. That's the evidence which you are to consider, nothing else. Okay. Just a caution.

At other recesses, the court told the jury to "bear in mind my admonition." At the end of the second day of trial, the court instructed the jury:

You are in recess and you're free to leave until nine-thirty tomorrow morning, but please bear in mind my admonition, particularly what I said today about the media. Just don't look at it. Just don't read the paper tonight. Don't look at the

TV. Wait until tomorrow night. Okay. You may leave. Thank you.

[¶ 29] In its opening instructions, the court instructed the jury:

You must decide all questions of fact in this case from the evidence received in this trial and not from any other source.

In its final instructions to the jury, the court instructed:

You should find the Defendant guilty only if you have a firm and abiding conviction of the Defendant's guilt based on a full and fair consideration of the evidence presented in the case and not from any other source.

[¶ 30] Juries are presumed to follow a trial court's instructions. *Asbridge,* 555 N.W.2d at 575. The trial court repeatedly instructed the jury to avoid exposure to news accounts of the trial and to decide the case on the basis of the evidence and not from any other source. Under these circumstances, we are not persuaded the trial court abused its discretion in declining to poll the jury as Osier requested.

[¶ 31] "We will not reverse a trial court's denial of a motion for a new trial unless the court abused its discretion in denying the motion." *State v. Lusby,* 1998 ND 19, ¶ 7, 574 N.W.2d 805. The trial court did not abuse its discretion in denying Osier's motion for a new trial because of the court's refusal to poll the jury about exposure to publicity.

V

[¶ 32] In his brief, Osier raised an issue about "[w]hether the use of testimony from [the young man] violated Osier's right to a fair trial insofar as said evidence was inherently suspect as a result of it being traded for immunity against prosecution." Osier did not further develop that issue in his brief, however. We, therefore, deem the issue abandoned. *Murchison v. State,* 1998 ND 96, ¶ 13, 578 N.W.2d 514. Furthermore, Osier did not raise this issue in his motion for a new trial. When a party moves for a new trial, any subsequent appeal is limited to review of grounds presented in the motion to the trial court. *State v. Syring,* 524 N.W.2d

97, 100 (N.D.1994). Accordingly, we decline to further address this issue.

### VI

[¶ 33] In his brief, Osier raised this issue: "Whether the 'Rape Shield' statute, N.D.C.C. 12.1–20–15 violates the separation of powers clause of the United States and North Dakota Constitution insofar as the legislature is impinging upon the powers of the courts regarding admissibility of relevant evidence?"[1] His only argument about the constitutionality of N.D.C.C. § 12.1–20–15 in his brief is the following sentence and citation:

> The trial court's refusal to allow cross examination of [the complainant] and [the young man] regarding [the complainant's] prior sexual activity upon the basis that the defense did not give proper notice to the prosecution regarding the introduction of said evidence through cross examination violated the separation of powers principle by attempting to legislatively create rules of procedure for courts; and thus resulted in an unconstitutional deprivation of Defendant's right to a fair trial. North Dakota Constitution, Article 6, Section 3.

This issue is governed by the following language in *State v. Syring*, 524 N.W.2d 97, 100 (N.D.1994):

> The depth and the magnitude of constitutional arguments requires those making such challenges either to prepare an adequate and thorough foundation to support their argument, or forego its presentation. *See Southern Valley Grain Dealers Ass'n v. Bd. of County Comm'rs of Richland County*, 257 N.W.2d 425, 434 (N.D.1977). The mere reference to a statute's constitutionality, with nothing more, does not meet the standard of persuasion required to mount an attack on constitutional grounds. *See City of Bismarck v. Uhden*, 513 N.W.2d 373, 377 n. 5 (N.D.1994).

Accordingly, we decline to further address this issue.

### VII

[¶ 34] Osier raised as an issue "[w]hether the trial court erred in sustaining eleven objections upon the basis of 'relevance.'" Absent an abuse of discretion, we will not reverse a trial court's determination on the relevance of evidence. *State v. Clark*, 1997 ND 199, ¶ 26, 570 N.W.2d 195. We conclude Osier has not shown the trial court abused its discretion in this regard.

### VIII

[¶ 35] Finally, Osier argues "the trial court erred in denying Osier's motion for new trial following the perverse compromise verdict; taking into consideration the totality of the circumstances which contributed to denying Mr. Osier a fair trial." As we have already determined, the not guilty verdict on Count 1 and the guilty verdicts on Counts 2 through 6 are easily explained by evidentiary differences. From our review of the record, we conclude the jury did not return a "perverse compromise verdict," and we conclude the "totality of the circumstances" did not deny Osier a fair trial.

### IX

[¶ 36] The judgment is affirmed.

[¶ 37] VANDE WALLE, C.J., and NEUMANN, SANDSTROM, and KAPSNER, JJ., concur.

---

1. N.D.C.C. § 12.1–20–15 was superseded by N.D.R.Ev. 412, effective March 1, 1998. *DeCoteau v. State*, 1998 ND 199, ¶ 11 n. 1, 586 N.W.2d 156.